**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| COLLEEN FINKL, | ) | No. 17 CV 4386 |
| Plaintiff, | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| KIRSTJEN M. NIELSEN, Secretary, United States Department of Homeland Security, | ) | January 4, 2019 |
| Defendant. | ) | |

### MEMORANDUM OPINION and ORDER

Plaintiff Colleen Finkl brings this action against her former employer, the Federal Emergency Management Agency ("FEMA"), which is part of the Department of Homeland Security, asserting claims of sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and "whistleblower" retaliation under the False Claims Act, 31 U.S.C. § 3729 ("FCA"). The parties have consented to this court's jurisdiction. (R. 14.) Before the court is FEMA's motion for summary judgment. (R. 35.) For the following reasons, the motion is granted:

### Rules Governing Summary Judgment Motions

Before summarizing the facts of this case, the court notes FEMA's objections that Finkl's responses to undisputed facts and statement of additional facts do not comply with Local Rule ("L.R.") 56.1 or Federal Rule of Civil Procedure 56(c). (R. 47, Govt.'s Reply at 2-8.) FEMA argues that Finkl's responses and statements of fact violate Local Rule 56.1(b) because they are neither simple nor concise, are peppered

with legal arguments, and do not include specific citations to marked exhibits, making it "nearly impossible" to locate the cited material. (Id. at 3-4.) Local Rule 56.1(b) requires the party opposing summary judgment to file responses and additional facts that include "specific references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(B), (C). This local rule "is designed, in part, to aid the district court, which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information, in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (internal quotation omitted). The rule serves to organize the evidence, identify undisputed facts, and demonstrate "precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon v. Chicago Sch. Reform Bd. of Trs.,* 233 F.3d 524, 527 (7th Cir. 2000).

FEMA also argues that Finkl violates Rule 56(c) by relying on inadmissible evidence, including her own declaration, a declaration of John Rooney, and two pages of an investigation report. (R. 47, Govt.'s Reply at 4-8.) Rule 56(c) requires evidence cited in opposition to summary judgment to be admissible. Fed. R. Civ. P. 56(c)(2). Furthermore, an affidavit or declaration used to oppose summary judgment must "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4)); *see also* Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has

personal knowledge of the matter."). "[C]onclusory allegations, unsupported by specific facts, will not suffice" to oppose summary judgment. *Trimble v. Alliance-DeKalb/Rock-Tenn Co.*, 801 F. Supp. 2d 764, 769 (N.D. Ill. 2011) (internal quotation and citation omitted). Further, an affiant's or declarant's "inferences must be grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience." *Id.* (internal quotation and citation omitted).

The court agrees that a number of Finkl's responses and additional facts do not comply with the applicable rules governing evidence presented in opposing summary judgment. The court disregards Finkl's responses and factual assertions that violate Local Rule 56.1 and/or Rule 56(c). *See id.* at 768-69; *see also Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (upholding district court's rejection of a Local Rule 56.1 statement of facts because "it failed to adequately cite the record and was filled with irrelevant information, legal arguments, and conjecture"). Specifically, the court rejects those portions of Finkl's responses that constitute legal argument or are not supported by personal knowledge, admissible evidence, correct citations to the record, or specific references to evidence. (See, e.g., R. 39, Pl.'s L.R. 56.1 Resp. ¶¶ 10, 11, 15-19, 22-34, 39-42, 45, 47.) The same ruling applies to Finkl's additional statement of facts, which also suffer from these deficiencies. (See, e.g., R. 45, Pl.'s L.R. 56.1 Stmt. ¶¶ 5, 12, 14-34.) *See Cichon v. Exelon Generation Co., L.L.C.,* 401 F.3d 803, 809-10 (7th Cir. 2005) ("A district court does not abuse its discretion when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to

ignore and not consider the additional facts that a litigant has proposed."). Additionally, the court does not rely upon the portions of Finkl's and Rooney's declaration or the investigation report that do not comport with procedural or evidentiary rules, including Rule 56(c) and Rule 602. (See, e.g., R. 39-12, Pl.'s Ex. 16, Finkl Decl. ¶¶ 11, 15, 20-23, 32, 35-36, 39, 46, 62, 65-68, 70-73, 76-79, 81-87; R. 39-13, Pl.'s Ex. 3, Rooney Decl. ¶¶ 4, 6, 10, 12-20; R. 39, Pl.'s L.R. 56.1 Resp., Ex. 26, Fraud and Internal Inv. Div. Rpt. at 8-9.) The court also does not rely upon FEMA's factual assertions that violate these rules. (See, e.g., R. 37, Govt.'s L.R. 56.1 Stmt. ¶¶ 28, 46.)

## Facts[1]

Finkl was an emergency management specialist at FEMA beginning in 2005. (R. 37, Govt.'s L.R. 56.1 Stmt. ¶ 2.) Finkl digitized flood maps, (id.), and worked with engineers and elected officials impacted by FEMA flood map changes, (R. 39, Pl.'s L.R. 56.1 Resp. ¶ 2). In 2006 Finkl was promoted to GS-13 in the National Preparedness Division, retaining the same title. (R. 37, Govt.'s L.R. 56.1 Stmt. ¶ 3.) Finkl received a promotion to GS-14 in 2009 when she became an Individual Assistance ("IA") Branch Chief, supervising staff and implementing FEMA's Individual Assistance Program ("IAP"). (Id.) The IAP provides grants for repairs and

---

[1] The following facts are taken from the parties' Local Rule 56.1 statements and responses. (R. 37; R. 39; R. 45; R. 48.) Where the parties disagree about material facts, the court presents each side's position but views the facts in the light most favorable to Finkl as the non-moving party. *See O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The court includes only the parties' facts that are appropriately presented, supported, and relevant.

other recovery efforts resulting from federally declared disasters. (Id.) Finkl remained in the IA Branch Chief position until June 2015, when she resigned. (Id.)

Between 2013 and 2015, Finkl reported to Paul Riccuiti as her first-line supervisor and Janet Odeshoo as her second-line supervisor. (Id. ¶ 4.) Riccuiti was the Recovery Division Director responsible for public assistance ("PA"), providing grants for infrastructure, and IA, providing grants for individuals and households. (Id. ¶ 5.) Odeshoo was Deputy Regional Administrator for FEMA's Region V. (R. 45, Pl.'s L.R. 56.1 Stmt. ¶ 15; see also R. 39-5, Pl.'s Ex. 8, Odeshoo Dep. 6:8-13.)

FEMA generally deploys employees from their base regional office to disaster sites after a federal disaster declaration. (R. 37, Govt.'s L.R. 56.1 Stmt. ¶ 6.) During deployment a FEMA employee performs more advanced duties and earns qualifications based on field experience. (Id. ¶¶ 6-7.) Such qualifications are logged in a "task book," which a Coach Evaluator approves. (Id. ¶ 7.) A Coach Evaluator is fully qualified in the field position and designated by FEMA headquarters to approve completed tasks for employees seeking qualification in a position. (Id.) A Coach Evaluator may or may not be a supervisor but may approve tasks for a supervisor who has not achieved qualification for that position. (Id.) For example, Finkl supervised Jean McGhee in the regional office, but in the field McGhee had served as an IA Branch Director ("IABD") since 1999 and had a higher qualification than Finkl, rendering McGhee eligible to supervise Finkl in the field. (Id. ¶¶ 8-9, 20.) As of 2015 McGhee had been deployed more than 60 times in 20 years and had performed every

IA position except one in the Joint Field Office ("JFO"). (Id.) Finkl had not yet attained the IABD qualification in the field. (Id. ¶ 10.)

## A.    The Michigan Disaster

After Michigan experienced severe storms and flooding in August 2014, President Obama in September 2014 declared three counties disaster areas, making PA and IA available to eligible applicants. (Id.; R. 45, Pl.'s L.R. 56.1 Stmt. ¶ 9.) Finkl alleges that she was identified as the IABD for the Michigan disaster and attended planning meetings as the IABD but then was denied the position. (R. 39, Pl.'s L.R. 56.1 Resp. ¶¶ 10, 11 (citing R. 39-12, Pl.'s Ex. 16, Finkl Decl. ¶ 11, which cites to R. 39-2, Pl.'s Ex. 6 instead of R. 39-10, Pl.'s Ex. 1, Jensen Dep. 63:2-4.)) FEMA disputes Finkl's assertions, claiming that Finkl "created an organization chart that identified herself as the IABD" for the Michigan disaster. (R. 37, Govt.'s L.R. 56.1 Stmt. ¶ 10.) As soon as Riccuiti became aware of the chart, he notified Finkl that she would not deploy as IABD because she was not qualified. (Id. ¶¶ 10, 33.) Riccuiti instead deployed McGhee as the IABD. (Id. ¶¶ 11, 12.) Odeshoo testified that she never considered anyone other than McGhee to serve as IABD for the Michigan disaster. (R. 48, Govt.'s L.R. 56.1 Resp. ¶ 5.)

To allow Finkl to fulfill operational tasks in the IABD task book to help qualify her for that position, Riccuiti obtained Odeshoo's authorization to deploy Finkl as the Deputy IABD. (R. 37, Govt.'s L.R. 56.1 Stmt. ¶¶ 13-15.) Finkl disagrees, asserting that as of September 2014 IA certifying official Tony Hake was in the process of upgrading Finkl's field qualification status and that such job title "right sizing" was

imminent, thereby negating any need for her to complete an IABD task book. (R. 39, Pl.'s L.R. 56.1 Resp. ¶¶ 10, 15.) Nonetheless, there is no evidence showing that FEMA waived Finkl's requirement to complete the task book or "right siz[ed]" her qualification to IABD before the declaration of the Michigan disaster. (Id.; see also R. 37-3, Govt.'s Ex. 3, Riccuiti Decl. ¶¶ 6, 9, 23.)

In response to Riccuiti's request to deploy Finkl to the Michigan disaster, Odeshoo asked for the length of the proposed deployment. (R. 37, Govt.'s L.R. 56.1 Stmt. ¶ 16.) Riccuiti advised Odeshoo that he required surgery that would result in him being out of the office beginning in October 2014. (Id.; R. 37-3, Govt.'s Ex. 3, Riccuiti Decl. ¶¶ 9, 10.) Odeshoo approved a 30-day deployment for Finkl with the understanding that Finkl would return to the regional office to help run the IA Division by the time of Riccuiti's surgery. (R. 37, Govt.'s L.R. 56.1 Stmt. ¶ 16; R. 48, Govt.'s L.R. 56.1 Resp. ¶ 6.) Riccuiti attests that he informed Finkl that she would deploy for no more than 30 days to the Michigan disaster. (R. 37, Govt.'s L.R. 56.1 Stmt. ¶ 16; R. 37-3, Govt.'s Ex. 3, Riccuiti Decl. ¶ 11.) Finkl disputes that there was a 30-day agreement. (R. 39, Pl.'s L.R. 56.1 Resp. ¶ 16.)

On September 28, 2014, Finkl deployed to the Michigan disaster as the Deputy IABD, with McGhee serving as IABD II and the Coach Evaluator charged with approving Finkl's task book entries. (R. 37, Govt.'s L.R. 56.1 Stmt. ¶¶ 17-18.) Finkl disputes that McGhee's title was IABD, asserting that it should have been the IA Group supervisor given the less complex level of disaster. (R. 39, Pl.'s L.R. 56.1 Resp. ¶ 17.) On October 28, 2014, Riccuiti informed Odeshoo that his surgery was

scheduled for November 3, 2014. (R. 37, Govt.'s L.R. 56.1 Stmt. ¶ 18.) Odeshoo asked whether Finkl could be released to return to the regional office to assist in Riccuiti's absence. (Id.) Riccuiti responded affirmatively and on November 1, 2014, advised Odeshoo that Finkl would return to the regional office on November 3, 2014. (Id.) Finkl was deployed to Michigan for 35 days. (Id.) Finkl never completed her IABD task book or qualified for that position. (Id. ¶ 33; R. 37-3, Govt.'s Ex. 3, Riccuiti Decl. ¶ 23.) Finkl asserts that she could not have done so in a 30-day period. (R. 39, Pl.'s L.R. 56.1 Resp. ¶ 33.)

Odeshoo attests that she was the decision-maker responsible for recalling Finkl back to the regional office. (R. 37, Govt.'s L.R. 56.1 Stmt. ¶ 18.) Finkl disputes that it was Odeshoo who made the decision to return her to the regional office, claiming that Assistant Administrator for Recovery Brad Kieserman and National Processing Service Center Branch Chief Kevin Souza referred to Finkl being demobilized in connection with fraud unit activities being shut down in Michigan. (R. 39, Pl.'s L.R. 56.1 Resp. ¶ 19.) In her summary judgment brief, however, Finkl admits, "I knew Odeshoo was responsible for my removal from the Michigan [JFO]." (R. 41, Pl.'s Resp. at 6.)

**B.    The Fraud Unit in Michigan**

FEMA's Fraud and Internal Investigation Division ("FIID") was deployed to the Detroit area on or about October 27, 2104, to determine whether applicants for recovery assistance were submitting fraudulent claims. (R. 37, Govt.'s L.R. 56.1 Stmt. ¶¶ 21, 24.) In her role as IABD II, McGhee observed Finkl "working closely

with" and "assisting" FIID in its investigations. (Id. ¶ 21.) Finkl disputes McGhee's attestations, asserting that Finkl and McGhee "worked closely" with each other "to complete the IA mission." (R. 39, Pl.'s L.R. 56.1 Resp. ¶ 21.) Finkl admits that she "would occasionally talk to the FIID" but states that McGhee "was involved in many of those meetings." (Id.)

FEMA never trained Finkl to investigate fraud during her Michigan deployment. (R. 37, Govt.'s L.R. 56.1 Stmt. ¶ 22.) Finkl's job description did not specifically identify any duties relating to conducting case reviews or investigating fraud. (Id.) Also, McGhee, Riccuiti, and Odeshoo did not ask or instruct Finkl to conduct case reviews or investigate fraud. (Id.; R. 37-3, Govt.'s Ex. 3, Riccuiti Decl. ¶ 13.) In any event, Finkl checked applicants' data in a FEMA database as well as in Facebook, GoFundMe pages, and other public websites in an effort to root out fraud. (R. 37, Govt.'s L.R. 56.1 Stmt. ¶ 22.)

Finkl clarifies that FEMA did not require employees to be trained in order "to report suspected fraud, waste and abuse." (R. 39, Pl.'s L.R. 56.1 Resp. ¶ 22.) She asserts that her position description was "general in nature and did not include specific tasks." (Id.) Finkl disputes FEMA's assertion that her supervisors never asked her to investigate fraud during her deployment to Michigan, objecting to the term "investigate" and claiming that Riccuiti was aware that she had been conducting "eligibility case reviews." (Id.) Finkl contends that McGhee asked her to conduct case reviews "for applicants who had received the maximum grant amount." (Id.)

Odeshoo was not aware that Finkl was "personally investigating recovery assistance applicants for fraud." (R. 37, Govt.'s L.R. 56.1 Stmt. ¶ 29.) Odeshoo attested that FIID's presence at the Michigan disaster was "unique" insofar as "the unit had rarely if ever been deployed to a disaster while applicants were receiving aid." (Id.; R. 37-2, Govt.'s Ex. 2, Odeshoo Decl. ¶ 13.) FIID did not coordinate its deployment through Federal Coordinating Officer Dolph Diemont, Odeshoo, Riccuiti, or McGhee. (R. 37, Govt.'s L.R. 56.1 Stmt. ¶¶ 23-25.)

Finkl disputes FEMA's alleged lack of knowledge regarding FIID's deployment to the Michigan disaster, citing in part an August 2014 email in which she informed Riccuiti that FIID was "on board with" sending a unit to Michigan "to get in front of fraud." (R. 39, Pl.'s L.R. 56.1 Resp. ¶ 23, Ex. 25.)[2] Riccuiti responded, "Great!" (Id.) Riccuiti and McGhee, according to Finkl, also participated in an October 9, 2014 conference call to discuss coordination with FIID during the Michigan disaster. (R. 45, Pl.'s Stmt. ¶¶ 4, 6.) Finkl asserts that FEMA's Chief Security Officer Dwight Williams authorized her to assist with a joint fraud task force during the Michigan disaster. (Id. ¶ 9.) FIID Director Rooney also attests that in October 2014 he briefed Diemont on FIID's mission for the Michigan disaster and received approval to deploy to the Michigan JFO. (R. 39-13, Pl.'s Ex. 3, Rooney Decl. ¶ 7.)

On October 28, 2014, Odeshoo notified Riccuiti and Diemont that the deployment of FIID to Michigan was being examined and that "questionable matters"

---

[2] Finkl refers to her declaration, R. 39-12, Pl.'s Ex. 16, Finkl Decl. ¶ 23, which cites in part Pl.'s Ex. 22. However, it appears Finkl intended to cite Pl.'s Ex. 25.

needed to be referred to FEMA's National Processing Service Centers ("NPSC"). (R. 37, Govt.'s L.R. 56.1 Stmt. ¶ 26.) Finkl disputes FEMA's factual assertion, quoting Odeshoo's email, which states in part, "please ensure that **no Region V or JFO staff** communicate in any way with the fraud unit and that no matters be referred to it." (R. 39, Pl.'s L.R. 56.1 Resp. ¶ 26 (citing R. 39-12, Pl.'s Ex. 16, Finkl Decl. ¶ 24, which incorrectly cites R. 39-8, but support is in Pl.'s Ex. 27) (emphasis in original).) The email further states, "if something doesn't look right to us, we should notify the NPSC or whoever else IA [headquarters] determines." (Id.) Also on October 28, 2014, John Carleton of FEMA contacted Finkl to discuss his concern about FIID being at the Michigan disaster and his disdain for case reviews. (R. 45, Pl.'s L.R. 56.1 Stmt. ¶ 13.)

Shortly thereafter, on or about October 30, 2014, Kieserman demobilized FIID, citing the high minority population in the disaster location and the potential for discrimination claims. (R. 37, Govt.'s L.R. 56.1 Stmt. ¶ 27.) Finkl disputes Kieserman's reason for shutting down the FIID unit in Michigan, asserting that Kieserman had become aware of a discrimination complaint based upon FEMA's fraud investigations. (R. 39, Pl.'s L.R. 56.1 Resp. ¶ 27.) Odeshoo also learned about the discrimination complaint and Finkl's involvement in fraud investigations of recovery assistance applicants. (R. 37, Govt.'s L.R. 56.1 Stmt. ¶¶ 28-29.) Finkl objects, arguing that she did not "investigate" any applicants but rather performed "case reviews for eligibility." (R. 39, Pl.'s L.R. 56.1 Resp. ¶ 29.)

FEMA asserts that it was not Finkl's responsibility to investigate fraud. (R. 37, Govt.'s L.R. 56.1 Stmt. ¶ 30.) FEMA contends that after an individual complained about fraud investigations on aid applicants during the Michigan disaster, at Odeshoo's request McGhee instructed Finkl not to communicate with FIID or to conduct any further fraud investigations. (Id. ¶ 38.) Nevertheless, Finkl continued to investigate fraud because she believed that a national FEMA "Fraud Prevention and Investigation Directive" superseded McGhee's instruction. (Id. ¶¶ 37-38; R. 45, Pl.'s L.R. 56.1 Stmt. ¶ 15.) Finkl responds that there was no FEMA policy requiring her to notify NPSC, as opposed to FIID, of fraud. (R. 39, Pl.'s L.R. 56.1 Resp. ¶ 30.)

## C.    Finkl's Claims

Finkl alleges that FEMA discriminated against her on the basis of her sex. (R. 45, Pl.'s L.R. 56.1 Stmt. ¶¶ 18-19; R. 1, Compl. ¶¶ 1, 39-48.) According to Finkl, other FEMA employees, including Odeshoo, Riccuiti, McGhee, and Jensen, "colluded to commit a negative personnel action to the Michigan disaster," treated her "differently" than male supervisors deployed to the disaster, subjected her to "greater scrutiny" during deployment, and created a hostile work environment for her. (R. 45, Pl.'s L.R. 56.1 Stmt. ¶¶ 18, 22, 27-28.) Finkl further alleges that Jamie McDaniel, a male FEMA employee, "was allowed to run" the PA program in connection with the 2014 Minnesota disaster, even though he did not have the Infrastructure Branch Director title at the time. (Id. ¶¶ 18-19.) Finkl thus claims that she was "treated disparately than a male." (Id. ¶ 19.) FEMA denies that McDaniel is a "comparator"

to Finkl because he was deployed as the PA lead, and PA is different than IA. (R. 48, Govt.'s L.R. 56.1 Resp. ¶¶ 16, 18-21.) FEMA also denies Finkl's remaining sex discrimination allegations. (Id. ¶¶ 22, 23, 27-28, 30.)

Finkl further alleges that she was retaliated against for whistleblowing by reporting fraud during the Michigan disaster. (R. 39, Pl.'s L.R. 56.1 Resp. ¶¶ 34; R. 1, Compl. ¶¶ 1, 33-38.) More specifically, Finkl testified that she was demobilized from the Michigan disaster "[f]or cooperating with FEMA's Internal Investigative Division and [whistleblowing] on waste, abuse and fraud." (R. 37-1, Govt.'s Ex. 1, Finkl Dep. 34:5-11.) When asked whether she was demobilized for any other reason, Finkl responded, "[n]o." (Id.) Finkl claims she was deprived of valuable field experience by being dismissed prematurely from the Michigan disaster. (R. 45, Pl.'s L.R. 56.1 Stmt. ¶ 24.) She also claims that by filing a complaint with DHS's Office of Inspector General, she was going to be moved to a non-supervisory position akin to human resources. (Id. ¶¶ 25-26.) FEMA denies Finkl's retaliation allegations. (R. 48, Govt.'s L.R. 56.1 Resp. ¶¶ 25-26, 29-30.)

## Analysis

Based on the parties' submissions, there are no genuine issues of material facts and FEMA is entitled to judgment as a matter of law.

## A. Summary Judgment Standard

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although reasonable inferences that can be drawn from the facts will be

viewed in favor of the non-moving party, the "mere existence of *some* alleged factual dispute" does not suffice to defeat summary judgment. *See Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015) (internal quotation and citation omitted) (emphasis in original). The court's role at this stage is not to "weigh the evidence or engage in fact-finding," but rather to "determine whether there is a genuine issue for trial." *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 527 (7th Cir. 2008). A genuine issue of "material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 504 (7th Cir. 2014) (internal quotation and citation omitted).

## B. Sex Discrimination Claim

Finkl claims that FEMA discriminated against her because she is a woman. Title VII renders unlawful sex discrimination by a federal employer against an employee. 42 U.S.C. § 2000e-16(a); *see also Khowaja v. Sessions*, 893 F.3d 1010, 1014 (7th Cir. 2018). Where discrimination is alleged, "all the evidence must be evaluated as a whole, and the legal standard is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [sex] caused the discharge." *Khowaja*, 893 F.3d at 1014 (internal quotation and citation omitted). Under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), the plaintiff initially carries the burden of showing that: "(1) she is a member of a protected class; (2) her job performance met [the employer's] legitimate expectations; (3) she suffered an adverse employment action; and (4) another similarly situated individual who was not in the protected class was treated more favorably," *McKinney*

*v. Office of Sheriff of Whitley Cnty.*, 866 F.3d 803, 807 (7th Cir. 2017) (internal quotation omitted). If the plaintiff satisfies her burden, then the employer must "articulate a legitimate, non-discriminatory reason" for the adverse employment action. *McKinney*, 866 F.3d at 807. If a non-discriminatory reason is articulated, the burden shifts back to the plaintiff to show that the proffered reason is a mere pretext for discrimination. *Id.*

Finkl alleges in conclusory fashion that she has demonstrated a prima facie case of sex discrimination. Indeed, Finkl asserts that "the second and fourth prongs [of the *McDonnell Douglas* framework] merge, and because the third prong of Plaintiff's *prima facie* case is clearly established as Plaintiff was subjected to the most adverse of all employment actions, termination, the only remaining prong to address is the fourth prong." (R. 41, Pl.'s Resp. at 15.) Finkl cites *Elkhatib v. Dunkin Donuts, Inc.*, 493 F.3d 827, 831 (7th Cir. 2007) (internal quotation and citation omitted), as support for merging the second and fourth factors "[w]hen a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate expectations in a disparate manner." But Finkl offers no analysis applying facts from the record to support a merger here. (R. 41, Pl.'s Resp. at 15.) The court therefore cannot conclude that she satisfies the second factor.

Nor can the court conclude that Finkl has proven the third or fourth factors—that she suffered an adverse employment action or that FEMA treated more favorably another similarly situated employee who was not a woman. As to an adverse employment action, Finkl points to her alleged termination. "A materially

adverse employment action is something more disruptive than a mere inconvenience or an alteration of job responsibilities." *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (internal quotation and citation omitted); *see also Porter v. City of Chi.*, 700 F.3d 944, 954 (7th Cir. 2012) (stating that a "materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices"). Here Finkl admits that she "left the Agency." (R. 41, Pl.'s Resp. at 15.) FEMA did not fire her.

Finkl does not argue that FEMA constructively discharged her. (R. 47, Govt.'s Reply at 13.) Nor can she given that such a claim requires proof that: (1) she suffered even more egregious sex-based harassment than required to show a hostile work environment; or (2) that FEMA indicated to Finkl that she would be terminated. *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). As to the first requirement, Finkl cites no specific facts showing that she was subjected to such egregious sex-based harassment that a reasonable person would find the working conditions intolerable. (R. 45, Pl.'s L.R. 56.1 Stmt. ¶¶ 27, 28.) *See Chapin*, 621 F.3d at 679 (finding sufficiently egregious working conditions for constructive discharge claim when plaintiff's safety was threatened). Regarding the second requirement, Finkl alleges that she did not learn until after she resigned that she would have been assigned to "mitigation," a role that was non-supervisory and akin to human resources. (R. 1, Compl. ¶ 37; see also R. 45, Pl.'s L.R. 56.1 Stmt. ¶ 25 (citing R. 39-12, Pl.'s Ex. 16, Finkl Decl. ¶ 65, which in turn cites Pl.'s Ex. 20, but that exhibit does

not lend support).)  A working condition does not become unbearable "merely because a prospect of discharge lurks in the background."  *Chapin*, 621 F.3d at 679 (internal quotation omitted).  Because Finkl did not learn about a purported transfer until *after* she resigned, she cannot prove constructive discharge.

In the alternative, Finkl claims that her discharge from the Michigan disaster "put a stain on [her] reputation throughout the Agency" and precluded her from "gain[ing] additional valuable field experience in Michigan."  (R. 45, Pl.'s L.R. 56.1 Stmt. ¶¶ 23-24 (citing R. 39-12, Pl.'s Ex. 16, Finkl Decl. ¶¶ 51-52).)  But she does not explain how her employment was materially affected by being returned to a permanent position where her job title was higher and her pay was the same.  (R. 36, Govt.'s Mem. at 10.)  Accordingly, Finkl has not shown that she suffered an adverse employment action.

As to the fourth *McDonnell Douglas* factor, Finkl has not shown that FEMA treated her less favorably than a similarly situated male employee.  To qualify as a comparator, a similarly situated employee "must be directly comparable to the plaintiff in all material respects."  *Khowaja*, 893 F.3d at 1015.  Nevertheless, "this is a flexible inquiry with no magic formula."  *Id.*  The Seventh Circuit has "cautioned . . . against overly technical or rigid interpretations" of the substantial similarity requirement.  *Elkhatib*, 493 F.3d at 831.  Here Finkl contends that McDaniel, a male FEMA employee, "was allowed to run" the PA program during the 2014 Minnesota disaster, despite the fact that he did not have an Infrastructure Branch Director title

at the time. (R. 45, Pl.'s L.R. 56.1 Stmt. ¶¶ 18-19.) Finkl thus claims that she was "treated disparately than a male." (Id. ¶ 19.)

FEMA denies that McDaniel is a "comparator" to Finkl because he was deployed as the PA lead, and PA is different than IA. (R. 48, Govt.'s L.R. 56.1 Resp. ¶¶ 16, 18-21.) While Finkl disputes FEMA's characterization of the differences between the PA and IA Branches, she testified that PA and IA are different in the following ways: "In general, [PA] grants are for infrastructure—roads, bridges[,] certain electrical co-ops; whereas [IA] . . . grants [are for] individuals and households." (R. 37-1, Govt.'s Ex. 1, Finkl Dep. 36:14-19; see also R. 37, Govt.'s L.R. 56.1 Stmt. ¶¶ 5, 48.) Finkl also testified that McDaniel would not have been deployed as IABD to the Michigan disaster because he was a PA employee. (R. 37-1, Govt.'s Ex. 1, Finkl Dep. 38:23-39:6; see also R. 37-3, Govt.'s Ex. 3, Riccuiti Decl. at 2 (attesting that "[t]here is a significant difference and experience level between the two assistance programs").) Finkl's Local Rule 56.1 responses point out additional differences, including that PA encompasses "Emergency Work such as flood fighting, debris removal, and other actions to save lives or protect public health and safety or improved property." (See R. 39, Pl.'s L.R. 56.1 Resp. ¶ 48 (citing her earlier responses in ¶¶ 5, 35).) Thus, the undisputed evidence shows that the PA Branch was not "directly comparable" to the IA Branch in which Finkl worked. *Khowaja*, 893 F.3d at 1014, 1016.

Additionally, Finkl has not shown that the same FEMA official treated McDaniel more favorably than Finkl. Although Finkl admits that she knew Odeshoo

made the decision to return her from the Michigan disaster, (R. 41, Pl.'s Resp. at 6), Finkl does not allege that Odeshoo was responsible for deploying McDaniel to the Minnesota disaster, (id. at 9; R. 45, Pl.'s L.R. 56.1 Stmt. ¶¶ 15-21). Such a distinction is important because "[d]ifferent decisionmakers may rely on different factors when deciding whether, and how severely, to discipline an employee." *Ellis v. United Parcel Serv., Inc.*, 523 F.3d 823, 826 (7th Cir. 2008). Finkl has not proven that McDaniel is a comparator for purposes of this case. She therefore has failed to establish a prima facie case for sex discrimination.

Even if Finkl had satisfied her initial burden under the *McDonnell Douglas* framework, her claim still would fail because she cannot survive the pretext analysis. FEMA asserts that Finkl has no evidence that FEMA's proffered reason for taking any adverse action against her was a pretext for discrimination. (R. 36, Govt.'s Mem. at 8-9.; *see also Holmberg v. Baxter Healthcare Corp.*, 901 F.2d 1387, 1391 (7th Cir. 1990)). Finkl responds that she was mistreated, "ripped out of Michigan" before she completed her task book, and "denied a position in Minnesota over a less qualified male" because of her sex. (R. 41, Pl.'s Resp. at 15.) The court concludes, however, that Finkl has not met her burden of showing that FEMA's explanations for these incidents were pretext for sex discrimination.

Finkl first points to FEMA's decision not to appoint her as IABD for the Michigan disaster as evidence of discriminatory animus. (Id. at 3.) Viewing the facts in the light most favorable to Finkl, FEMA initially identified her as the IABD for the Michigan disaster but later denied her this position. (R. 39, Pl.'s L.R. 56.1 Resp.

¶¶ 10, 11 (citing R. 39-12, Pl.'s Ex. 16, Finkl Decl. ¶ 11); R. 39-10, Pl.'s Ex. 1, Jensen Dep. 63:2-4.) FEMA disputes Finkl's recitation of these facts and Odeshoo—Finkl's second-line supervisor who also is a woman—attests that Finkl was never in the running for the IABD position. (R. 48, Govt.'s L.R. 56.1 Resp. ¶ 5; R. 48-1, Govt.'s Ex. 10, Odeshoo Second Decl. ¶ 4.) Regardless, even if Finkl were slotted for the IABD position, Finkl cites no evidence suggesting that her sex played any role in FEMA's decision to instead deploy McGhee—another woman—as IABD for the Michigan disaster. McGhee had been qualified as IABD since 1999 and had considerable experience serving in that and other IA positions in the field. (See R. 37, Govt.'s L.R. 56.1 Stmt. ¶¶ 8-9, 20.) By contrast, Finkl was not qualified for the IABD position.[3] (Id. ¶ 10.) And FEMA deployed Finkl as the Deputy IABD so that she could fulfill tasks for the IABD qualification.[4] (R. 37, Govt.'s L.R. 56.1 Stmt. ¶ 15.) Given these facts, no reasonable juror could find that FEMA discriminated against

[3] Finkl admits that she had not completed the IABD task book but nonetheless argues that she was qualified to serve as IABD. (R. 39, Pl.'s L.R. 56.1 Resp. ¶ 10.) For support she cites her unsupported declaration, (id. (citing R. 39-12, Pl.'s Ex. 16, Finkl Decl. ¶¶ 10, 12-15)), which claims that FEMA's certifying official "was in-process of upgrading Finkl's title" without requiring completion of the IABD task book, (id. (citing R. 39-12, Pl.'s Ex. 16, Finkl Decl. ¶ 15)). Finkl contends that another FEMA employee "refused to sign off" on the upgrade request "based on her gender and her protected activity" but cites no supporting facts. (Id.) Such "flights of fancy, speculations, hunches, intuitions, or rumors" do not suffice to oppose summary judgment. See Trimble, 801 F. Supp. 2d at 769.

[4] Finkl disputes that she needed to fulfill her IABD task book, asserting that FEMA's certifying official was close to "right sizing" her title without requiring completion of the task book. (R. 39, Pl.'s L.R. 56.1 Resp. ¶ 15.) As discussed supra note 3, such speculation is not enough to create a genuine dispute for summary judgment purposes.

Finkl based on her sex by appointing her as the Deputy IABD, rather than as IABD, for the Michigan disaster.

Finkl next points to her demobilization from the Michigan disaster as evidence of discrimination. FEMA explains that Odeshoo and Riccuiti had agreed before Finkl's deployment that Finkle would deploy for a 30-day period. (R. 36, Govt.'s Mem. at 9 (citing R. 37, Govt.'s L.R. 56.1 Stmt. ¶¶ 13-19).) Finkl disputes that there was a 30-day length of her deployment and asserts that at least 60 days would have been needed to complete the IABD task book. (R. 39, Pl.'s L.R. 56.1 Resp. ¶ 16.) For support Finkl cites an email from Odeshoo to McGhee stating, "[Riccuiti] should have set a deactivation date with [Finkl] at the beginning. I'm not real happy with him that he did not." (Id. (incorrectly citing R. 39-12, Pl.'s Ex. 16, Finkl Decl., but support is in R. 39-1, Pl.'s Ex. 5, Nov. 1, 2014 Email from Odeshoo to McGhee.)) Finkl does not quote another part of the email stating, "[The] agreement between me and Paul was for a month. It is time for her to return. Plus [Riccuiti] will be out for several days . . . and she needs to be back in the region to help . . . run the division." (Id.)

For further support Finkl cites a FIID investigation report stating that Riccuiti confirmed he had no 30-day agreement with Odeshoo. (R. 45, Pl.'s L.R. 56.1 Stmt. of Additional Facts ¶ 26.) Riccuiti testified otherwise at his deposition, confirming that he in fact had such an agreement with Odeshoo. (R. 48, Govt.'s L.R. 56.1 Resp. ¶ 26 (citing R. 48-2, Govt.'s Ex. 11, Riccuiti Dep. 39:5-40).) Riccuiti disputes the accuracy of the FIID report. (Id. (citing R. 48-2, Govt.'s Ex. 11, Riccuiti Dep. 41:17, 88:14-90:15).) FEMA also objects to the admissibility of the FIID investigation report,

arguing that it is incomplete because Finkl attached only two of thirteen pages, and that it constitutes inadmissible hearsay not subject to an exception. (R. 47, Govt.'s Reply at 6-8.) FEMA asserts that the report is unreliable because Riccuiti's answers were not recorded accurately, (R. 48, Govt.'s L.R. 56.1 Resp. ¶ 26 (citing R. 48-2, Govt.'s Ex. 11, Riccuiti Dep. 41:17, 88:14-90:15)), and the investigators did not interview Odeshoo and five other relevant witnesses, (R. 47, Govt.'s Reply at 6-7). FEMA further contends that investigators for the same FIID group also were investigating Finkl's "whistleblowing" complaint, thereby rendering the investigators biased and partial. (R. 47, Govt.'s Reply at 7.) Because the FIID report does not comport with procedural or evidentiary rules, including Rule 56(c) and Rule 602, the court does not rely on it at the summary judgment stage.

Regardless, no facts related to the alleged 30-day agreement suggest that FEMA was creating a pretext for sex discrimination. Indeed, during her deposition Finkl refuted the notion that sex played a role in her demobilization:

Q:      [W]hen in October were you demobilized?
A.      I believe on October 31st; on or about.
Q:      And why do you believe you were demobilized?
A:      For cooperating with FEMA's Internal Investigative Division and whistle blowing on waste, abuse and fraud.
Q:      Is there any other reason?
A.      No.

(R. 37-1, Govt.'s Ex. 1, Finkl Dep. 34:1-11.) Finkl also admits in her opposition brief that "Odeshoo [a woman] was responsible for [her] removal from the Michigan

[JFO]."[5] (R. 41, Pl.'s Resp. at 6.) Thus, even by Finkl's own account, she was demobilized for cooperating with FIID, not as a pretext for sex discrimination.

Finkl's summary judgment submissions confirm the absence of evidence showing that FEMA's reasons for demobilizing Finkl were pretextual. Finkl cites facts relating to her "perceived association" with FIID as the reason for her demobilization. (Id. at 3-8.) Indeed, Finkl admits that "[s]ome [FEMA] staff were uncomfortable with FIID being deployed to the disaster." (Id. at 3.) Those members included Odeshoo, McGhee, Jensen, and Julie Pardini, all women.[6] (Id. at 5, 8.) Finkl states that on October 28, 2014, Carleton contacted her to discuss his concern about FIID being at the Michigan disaster and his disdain for eligibility case reviews. (Id. at 5.) According to Finkl, Odeshoo sent an email later that day stating that "**no Region V or JFO staff**" was permitted to communicate with FIID. (Id.) The following day Odeshoo sent an email to Kieserman stating, "I've had it. Time to quietly disband whatever this 'fraud unit' is and call [Finkl] back to the region. A lot of good people and hard work are being overshadowed by this matter and I am done."[7]

---

[5] Finkl disputes that Odeshoo was "the decision-maker regarding Finkl being demobilized back to the regional office." (R. 39, Pl.'s L.R. 56.1 Resp. ¶ 19.) But in her opposition brief, Finkl admits that she knew Odeshoo "was responsible" for her demobilization. (R. 41, Pl.'s Resp. at 6.)

[6] McGhee was Finkl's superior in the field. (R. 37, Govt.'s L.R. 56.1 Stmt. ¶ 11.)

[7] On October 29, 2014, FEMA received an anonymous complaint alleging that Finkl and FIID were discriminating against recovery assistance applicants in Michigan. (R. 36, Govt.'s Mem. at 6 (citing R. 37, Govt.'s L.R. 56.1 Stmt. ¶ 28).) Finkl objects that the complaint is inadmissible hearsay. (R. 39, Pl.'s L.R. 56.1 Resp. ¶ 28.) The court does not rule on Finkl's objection at this time and does not rely on the complaint in ruling on the current motion for summary judgment.

(R. 39, Pl.'s L.R. 56.1 Resp. ¶ 28 (incorrectly citing Pl.'s Ex. 28, but support is found in R. 39-4, Pl.'s Ex. 9 at 6, Oct. 29, 2014 Email from Odeshoo to Kieserman).) Odeshoo also emailed Riccuiti stating, "I'm pissed. We have an outstanding operation in MI and are now being accused of possibly committing discrimination due to unpresented [sic] levels of scrutiny because of concerns of applicant fraud." (Id. (incorrectly citing Pl.'s Ex. 28, but support is found in R. 39-4, Pl.'s Ex. 9 at 1, Oct. 29, 2014 Email from Odeshoo to Riccuiti).) None of this suggests that FEMA's proffered explanation for demobilizing Finkl was pretext for sex discrimination.

Perhaps recognizing the lack of evidence pointing to sex discrimination, Finkl attempts to pivot and allege that FEMA retaliated against her. But Finkl did not plead a cause of action for Title VII retaliation in her complaint. (R. 1, Compl.; see also R. 47, Govt.'s Reply at 14-15.) Instead, she pleaded claims for unlawful retaliation under the Whistleblower Protection Provision of the FCA, (R. 1, Compl. ¶¶ 33-38), and sex discrimination under Title VII, (id. ¶¶ 39-48). Finkl's Title VII claim never mentions retaliation. (Id. ¶¶ 39-48.) Finkl is prohibited from "amend[ing] her] complaint through arguments in [a] brief in opposition to a motion for summary judgment." *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 606 (7th Cir. 2000) (citation omitted).

Even if Finkl had stated a valid claim for Title VII retaliation in her complaint, such a claim would fail. Finkl cites Seventh Circuit jurisprudence finding that retaliation is a "proscribed factor" qualifying for Title VII protection if it caused an adverse employment action. (R. 41, Pl.'s Resp. at 14 (citing *Lord v. High Voltage*

*Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016)).) Yet the case law relied upon by Finkl requires that the protected activity "concern the type of conduct that Title VII prohibits." *Lord*, 839 F.3d 563. In *Lord* the plaintiff had no "*reasonable* belief that he was opposing an unlawful practice" defined by Title VII. *Id.* at 563 (emphasis in original). The plaintiff's retaliation claim therefore failed "for lack of evidence that he engaged in protected activity" under Title VII. *Id.*

Finkl's Title VII claim, had she alleged one, would suffer the same ill fate here. To be actionable Finkl's protected activity must have related to her "race, color, religion, sex, or national origin." *Id.* at 561 (citing Title VII, 42 U.S.C. § 2000e-2(a)(1)), 563. Here there is no evidence suggesting that Finkl suffered an adverse employment action because she complained about sex discrimination. "Without evidence of a prohibited motive" under Title VII, even a sincere belief by Finkl that she was complaining about sex discrimination could not have been "objectively reasonable." *Id.* Accordingly, the court concludes that Finkl's purported Title VII reprisal claim cannot survive summary judgment.

## C.    **Whistleblower Claim**

Finkl next claims that FEMA violated the FCA by retaliating against her for "pointing out waste, fraud, and abuse." (R. 1, Compl. ¶¶ 28, 29, 37.) More specifically, Finkl asserts that FEMA retaliated by: (1) not qualifying or appointing her as IABD for the Michigan disaster; (2) demobilizing her from the Michigan disaster; (3) "manipulating the year end performance ratings of her subordinates' performance appraisals"; and (4) informing her that if she had not resigned, she would have been

25

moved to the mitigation department. (Id. ¶ 37.) FEMA argues that Finkl's only avenue for a whistleblower complaint is the Whistleblower Protection Act ("WPA"), not the FCA. (R. 36, Govt.'s Mem. at 12-13.) But even then, FEMA contends that Finkl's claim fails because she did not exhaust her administrative remedies. (Id.)

Finkl does not address FEMA's arguments in her opposition. (R. 41, Pl.'s Resp. at 15-17.) She seems to acknowledge error on her part. Finkl instead asserts in a heading that "genuine issues of material fact . . . preclude summary judgment on the issue of FEMA's liability for retaliation for engaging in a protected activity under the Whistleblower's Protection Act." (Id. at 15 (capitalization omitted).) But beneath that heading, Finkl refers only to Title VII in connection with her retaliation claim. As explained above, Finkl may not amend her complaint through arguments in a summary judgment response brief. *See Insolia*, 216 F.3d at 606. And in any event, her whistleblower retaliation claim is not actionable under Title VII because it does not concern sex discrimination. *See Lord*, 839 F.3d 563.

Furthermore, FEMA correctly argues that Finkl may not pursue her whistleblower retaliation claim in this court. FEMA asserts that as a federal employee, Finkl may only bring a whistleblower action under the WPA. (R. 36, Govt.'s Mem. at 12-13.) For support FEMA cites *Richards v. Kiernan*, 461 F.3d 880, 885-86 (7th Cir. 2006). While *Richards* does not expressly discuss FCA claims, the Seventh Circuit in that case found that a former federal employee could not pursue a First Amendment claim alleging that his supervisors retaliated against him in response to whistleblowing activities. *Id.* at 882, 885. "By creating the [Civil Service

Reform Act ("CSRA"), 5 U.S.C. § 1100], Congress implicitly repealed the jurisdiction of federal district courts over personnel actions arising out of federal employment." *Richards*, 461 F.3d at 883. In holding that, "[t]here is no question but that the CSRA provides the exclusive remedy for an alleged constitutional violation . . . arising out of federal employment," the court noted that "[o]ther circuits have specifically concluded that the CSRA provides the exclusive remedy for claims brought pursuant to the WPA." *Id.* at 885 (citing *Stella v. Mineta*, 284 F.3d 135, 142 (D.C. Cir. 2002)). Thus, the CSRA provides the sole remedy for Finkl's whistleblower retaliation here, regardless of whether she styles it as an FCA or WPA claim. *Id.*

Finkl lacks substantive legal rights to pursue her claim in this court because she has not followed the procedural framework set forth in the CSRA. *Id.* at 886. A federal employee who alleges unlawful retaliation first must exhaust her administrative remedies, starting with bringing her claim to the Office of Special Counsel. *Heard v. United States Dep't of State*, No. 08-2123, 2010 WL 3700184, at *6 (D.D.C. Sept. 17, 2010). From there, the employee can appeal to the Merit Systems Protection Board ("MSPB"). *See Hardy v. Hamburg*, 69 F. Supp. 3d 1, 6 (D.D.C. 2014). "[J]udicial review of a final decision by the MSPB then lies with the United States Court of Appeals for the Federal Circuit, and not with the district courts" or any other circuit court. *Richards*, 461 F.3d at 886. Here Finkl did not exhaust her administrative remedies or abide by the procedures set forth in the CSRA. The court therefore finds that her whistleblower retaliation claim cannot avoid summary judgment.

**Conclusion**

For the foregoing reasons, FEMA's motion for summary judgment is granted.

**ENTER:**

_____

**Young B. Kim**
**United States Magistrate Judge**